UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                    Plaintiff,

        - against -

111 EAST 88TH PARTNERS,

                  Defendant.

**<u>ORDER</u>**

16 Civ. 9446 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff United States of America alleges that Defendant 111 East 88th Partners violated the Fair Housing Act (the "FHA") by (1) denying a reasonable accommodation to rent-controlled tenant Gregory Reich by prohibiting him from keeping an emotional support animal in his apartment, in violation of 42 U.S.C. § 3604(f)(2), (3)(B); and (2) interfering with Reich's exercise of his rights under the FHA through coercion, intimidation, and threats, in violation of 42 U.S.C. § 3617.  (Am. Cmplt. (Dkt. No. 31) ¶¶ 40-45)

        The parties have cross-moved for summary judgment.  Defendant contends that it is entitled to summary judgment because (1) this case is barred by <u>res judicata</u>, collateral estoppel, and the <u>Rooker-Feldman</u> doctrine; and (2) it never refused Reich's request for a reasonable accommodation.  (Def. Br. (Dkt. No. 137))  The Government seeks summary judgment on Defendant's <u>res judicata</u> and collateral estoppel defenses.  (Govt. Br. (Dkt. No. 128))  For the reasons set forth below, Defendant's motion will be denied, and the Government's motion will be granted.

# BACKGROUND

## I.  FACTS[1]

Gregory Reich is 57 years old and has lived in the same rent-controlled apartment – located at 111 East 88th Street in Manhattan – for his entire life.  (Govt. R. 56.1 Stmt. (Dkt. No. 129) ¶ 1; Reich Decl. (Dkt. No. 131) ¶¶ 1-2; Def. R. 56.1 Stmt. (Dkt. No. 138) ¶¶ 2-3)  Reich lives in the apartment with his husband, Alan Miller, and his dog, Chablis.  (Reich Decl. (Dkt. No. 131) ¶ 1)  He rents the apartment from Defendant.  (Reich Decl. (Dkt. No. 131) ¶ 2; Def. R. 56.1 Stmt. (Dkt. No. 138) ¶ 2)

### A.  Reich's Medical Condition

Reich has struggled with depression since he was a teenager.  (Govt. R. 56.1 Stmt. (Dkt. No. 129) ¶ 2)  He has received therapy from Jerry Katz, a clinical social worker, for more than 16 years.  (Id. ¶ 3)  Katz has diagnosed Reich with a number of mental disorders, including Dysthymic Disorder, Schizoid Personality Disorder, Narcissistic Personality Disorder, and Other Specified Personality Disorder.[2]  (Sept. 5,

---

[1]  Unless otherwise indicated, the Court cites facts drawn from Local Rule 56.1 statements because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of N.Y., 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

[2]  "[D]ysthymia . . . is a continuous long-term (chronic) form of depression."  Persistent depressive disorder (dysthymia), MAYOCLINIC.ORG, www.mayoclinic.org/diseases-conditions/persistent-depressive-disorder/symptoms-causes/syc-20350929.  "Schizoid personality disorder is an uncommon condition in which people avoid social activities[,] . . . consistently shy away from interaction with others[,] . . . [and] have a limited range of emotional expression."  Schizoid personality disorder, MAYOCLINIC.ORG, www.mayoclinic.org/diseases-conditions/schizoid-personality-disorder/symptoms-causes/syc-20354414.  "Narcissistic personality disorder . . . is a mental condition in which people have an inflated sense of their own importance, a deep need for excessive attention and admiration, troubled relationships, and a lack of empathy for others.  But behind this mask of extreme confidence lies a fragile self-esteem that's vulnerable to the slightest criticism."  Narcissistic personality disorder, MAYOCLINIC.ORG, www.mayoclinic.org/diseases-conditions/narcissistic-personality-disorder/symptoms-

2014 Justice Silver Order (Dkt. No. 140-12) at 2; Oct. 24, 2006 Katz Ltr. (Dkt. No. 140-5) at 3; June 8, 2015 Katz Ltr. (Dkt. No. 140-19) at 3; May 11, 2017 Katz Ltr. (Dkt. No. 140-34) at 4)[3]  Although Reich's diagnoses have changed over the years, he has consistently shown signs of depression and characteristics of one or more personality disorders.  (June 8, 2015 Katz Ltr. (Dkt. No. 140-19) at 3; May 11, 2017 Katz Ltr. (Dkt. No. 140-34) at 4)

Reich also suffers from physical ailments, including diabetes, high blood pressure, high cholesterol, and coronary artery disease.  (Aug. 12, 2015 Interview Record (Dkt. No. 140-28) at 4; May 4, 2017 Dr. Shuchita Sharma Ltr. (Dkt. No. 140-34); June 28, 2013 Dr. Anelise Engel Ltr. (Dkt. No. 140-11))  In 2002, he exhibited signs of stage-two diabetic kidney disease.  (Def. R. 56.1 Stmt. (Dkt. No. 138) ¶ 16).  And in March 2015, he was diagnosed with end stage renal disease ("ESRD").[4]  (Govt. R. 56.1 Stmt. (Dkt. No. 4) ¶ 5; June 8, 2015 Katz Ltr. (Dkt. No. 140-19) at 3)

Reich began dialysis treatment shortly thereafter, and he currently receives dialysis treatments at home four or five times per week.  (Govt. R. 56.1 Stmt. (Dkt. No. 4) ¶ 6; May 4, 2017 Dr. Sharma Ltr. (Dkt. No. 140-34) at 3)  Each treatment usually

_____

causes/syc-20366662.  "[Other Specified Personality Disorder] is a diagnostic category describing problems with inter and intrapersonal functioning (i.e., personality disorder) that are not accounted for by . . . specific personality disorder diagnoses. . . ."  Benjamin N. Johnson and Kenneth N. Levy, Personality Disorder Not Otherwise Specified (PDNOS), ENCYCLOPEDIA OF PERSONALITY AND INDIVIDUAL DIFFERENCES (2017), available at https://link.springer.com/referenceworkentry/10.1007%2F978-3-319-28099-8_924-1.

[3]  Citations to page numbers refer to the pagination generated by this District's Electronic Case Files ("ECF") system.

[4]  "End-stage renal disease . . . occurs when chronic kidney disease – the gradual loss of kidney function – reaches an advanced state. . . . [Y]our kidneys are no longer able to work as they should to meet your body's needs. . . . [Y]ou need dialysis or a kidney transplant to stay alive."  End-stage renal disease, MAYOCLINIC.ORG, www.mayoclinic.org/diseases-conditions/end-stage-renal-disease/symptoms-causes/syc-20354532.

involves being attached to a machine for at least four hours.  (Govt. R. 56.1 Stmt. (Dkt. No. 4) ¶ 7)  Reich describes his apartment as "a hospital room" because it has so much medical equipment.  (Id. ¶ 13)  When Reich first received his ESRD diagnosis, he was distressed and felt "as though death was staring [him] in the face."  (Id. ¶ 10)  Dialysis treatment causes Reich to become tired, weak, and uninterested in socializing.  (Id. ¶ 12)  His condition severely limits his ability to travel.  (Id.)

> ### B.   Reich's Lease and Dog Ownership

Reich's lease prohibits him from having a dog in his apartment without Defendant's written permission.  (Def. R. 56.1 Stmt. (Dkt. No. 138) ¶ 5)  Since 1997, however, Reich has had a pet dog in his apartment without obtaining Defendant's permission.  (Id. at 2 ¶ 6)[5]

Reich adopted his first dog, Orion, in 1997.  (Id. at 2 ¶ 7; Civil Court Order (Dkt. No. 140-3) at 2)  After Orion died in 2006, Reich adopted Maddy.  (Def. R. 56.1 Stmt. (Dkt. No. 138) at 2 ¶ 8)  Maddy died in 2017, and Reich then adopted Chablis. (Id. at 2 ¶ 9)

> ### C.   State Court and Administrative Proceedings

In August 1998, Defendant commenced eviction proceedings against Reich in New York County Civil Court for violating his lease's provision barring dogs. (Id. at 2 ¶ 10; Govt. R. 56.1 Stmt. (Dkt. No. 129) ¶ 21)  In an April 27, 1999 decision, the Civil Court dismissed the case, finding that Defendant had waived its right to enforce the no-dogs lease provision.  (Apr. 27, 1999 Civil Court Order (Dkt. No. 140-3) at 6) Defendant had waited more than three months after it had notice of the dog to commence

---

[5]  Multiple paragraphs in Defendant's Local Rule 56.1 Statement are numbered 6 to 14. In citing to these paragraphs, the Court includes the page number as well.

eviction proceedings.  (Id. at 5-6)  On January 10, 2002, the Appellate Term, First

Department affirmed.  (Def. R. 56.1 Stmt. (Dkt. No. 138) at 3 ¶ 7)

When Reich adopted Maddy in 2006, Defendant again commenced

eviction proceedings against him.  (Govt. R. 56.1 Stmt. (Dkt. No. 129) ¶¶ 22-23)  On

November 20, 2006, Reich filed a complaint with the U.S. Department of Housing and

Urban Development ("HUD"), asserting that Defendant had denied him a reasonable

accommodation by prohibiting him from having an "emotional support pet."  (Def. R.

56.1 Stmt. (Dkt. No. 138) at 4 ¶ 9)  HUD referred Reich's complaint to the New York

State Division of Human Rights (the "NYSDHR") – an agency that enforces the New

York State Human Rights Law – for investigation.  (Id. at 4 ¶ 10)  HUD has certified the

NYSDHR as a "substantially equivalent" agency under 24 C.F.R. § 115.205 and 42

U.S.C. § 3610(f).[6]  (Id. at 4 ¶ 11)  The NYSDHR receives funding through contracts with

HUD to carry out its work.  (Id. ¶¶ 38, 107)

In a March 21, 2007 decision, the NYSDHR issued a "probable cause"

determination with respect to Reich's complaint.  (Id. at 4 ¶ 12; Mar. 21, 2007 NYSDHR

Determination (Dkt. No. 140-6))  On September 26, 2007, the Civil Court stayed the

eviction proceedings against Reich pending the resolution of the NYSDHR case.[7]  (Sept.

26, 2007 Civil Court Order (Dkt. No. 140-18))

Rather than litigate the complaint through the NYSDHR's administrative

process, Defendant elected – pursuant to New York Executive Law § 297.9 – to have the

Division commence a lawsuit in state court.  (Govt. R. 56.1 Stmt. (Dkt. No. 129) ¶ 27;

---

[6]  Such certification is available only where "the substantive rights protected by [the]
agency . . . are substantially equivalent to those created by [the FHA]."  42 U.S.C.
§ 3610(f).

[7]  The eviction proceedings remain stayed.  (Def. R. 56.1 Stmt. (Dkt. No. 138) ¶ 8)

Goldstein Aff. (Dkt. No. 132-4) ¶ 6) see N.Y. Exec. Law § 297.9 ("Any party to a housing discrimination complaint shall have the right . . . to elect to have an action commenced in a civil court. . . ."). After a landlord elects to have an action proceed in court, the NYSDHR "is entirely responsible for filing and prosecuting" that action "on behalf of the State of New York." (Govt. R. 56.1 Stmt. (Dkt. No. 129) ¶ 30) HUD had no involvement "in any decisionmaking by NYSDHR as to the course of [the] litigation." (Id. ¶¶ 38-39)

On May 10, 2007, the NYSDHR commenced an action against Defendant in Supreme Court of the State of New York, New York County. (Def. R. 56.1 Stmt. (Dkt. No. 138) 4 ¶ 13) In its complaint, the NYSDHR asserts that Reich "suffers from both physical and mental disabilities, including dysthymic disorder, depression, diabetes, dyslipidemia [high cholesterol], and obesity," and that Defendant has "refused to permit [Reich] to keep his emotional support pet." (May 10, 2007 NYSDHR Cmplt. (Dkt. No. 140-7) ¶¶ 7, 13) The NYSDHR charged that Defendant denied Reich a "reasonable accommodation . . . which [was] necessary due to his disability," in violation of the New York State Human Rights Law. (Id. ¶¶ 15, 29) The case was litigated over the next seven years.

To establish Reich's disability, the NYSDHR relied on the testimony of Reich's therapist, Katz. (Def. R. 56.1 Stmt. (Dkt. No. 138) ¶ 19) In a September 5, 2014 decision, however, New York Supreme Court Justice George Silver granted Respondents' motion in limine to preclude Katz's testimony. (Sept. 5, 2014 Justice Silver Order (Dkt. No. 140-12))

As of 2006, Katz diagnosed Reich with Dysthymic Disorder. (Sept. 5, 2014 Justice Silver Order (Dkt. No. 140-12) at 1-2) In a 2011 affidavit, however, Katz

changed Reich's diagnosis to Schizoid Personality Disorder.  (Id. at 2)  And in March

2014, Katz opined that Reich no longer met the criteria for either condition.  (Id.; Govt.

R. 56.1 Stmt. (Dkt. No. 129) ¶ 32)  Katz planned to testify that Reich's severe depression

could return if he were not allowed to keep his dog, but Justice Silver precluded that

proposed testimony as speculative.  (Sept. 5, 2014 Justice Silver Order (Dkt. No. 140-12)

at 2, 4 (precluding Katz's opinion that Reich's depression may "worsen if he is not

allowed to keep his dog," finding that there was no "actual evidence" supporting that

theory))

       At an October 29, 2014 hearing, the NYSDHR conceded that Justice

Silver's in limine ruling "precluded . . . all relevant issues," leaving "no issues left to try."

(Oct. 29, 2014 Tr. (Dkt. No. 132-6) at 3)  Accordingly, Justice Silver dismissed the

NYSDHR's action (id. at 5), and judgment was entered in Defendant's favor.  (Judgment

(Dkt. No. 140-16))

### D.    Reich's 2014 HUD Complaint

       On November 25, 2014 – shortly after the NYSDHR's action was

dismissed – Reich filed a new complaint with HUD alleging that Defendant had

discriminated against him by refusing to accommodate his request to keep an "emotional

support pet" in his apartment, and had retaliated against him for filing his 2006 complaint

with HUD.  (Def. R. 56.1 Stmt. (Dkt. No. 138) ¶ 25)

       Reich's new complaint includes the following chronology:

> Based on the recommendation of my psychotherapist, [my husband and I] adopted Maddy in 2006, after the death of Orion, our first dog. . . .
>
> The landlord wasted no time in starting another eviction case in Housing Court.  I had requested a reasonable accommodation based on my physical and mental conditions, but my request as ignored.  I filed a complaint with HUD. . . .

> HUD referred my [2006] complaint to the New York State Division of
> Human Rights for investigation.  After that agency issued a probable cause
> determination in my favor, the landlord elected to have the case heard in
> civil court.  It was litigated for eight years while the eviction case was
> stayed, but in September . . . that case [was] decided against me, without a
> trial. . . .
>
> For the past eight years, Maddy has provided me with nonjudgmental
> comfort and support.  She forces me outside and into situations where I
> interact with people.  She calms me down and helps control my anxiety
> level.  I do not think I can function without her. . . .
>
> Now that [the] [NY]SDHR has decided not to appeal the court's decision,
> I am in danger of eviction or having to remove [my dog] Maddy. . . .
>
> I expect the landlord to rush back to Housing Court to demand our
> immediate eviction.  Please help us[;] HUD is our last resort.

(Nov. 25, 2014 HUD Cmplt. (Dkt. No. 140-14))

During its investigation of Reich's new complaint, HUD spoke with counsel for the NYSDHR, who advised that his agency "ultimately decided not to appeal [Justice Silver's decision] because of the weak set of facts."  (Def. R. 56.1 Stmt. (Dkt. No. 138) ¶ 34)  In a March 5, 2015 letter, HUD informed Reich that it could not reinvestigate his 2006 complaint because of "the legal principle of <u>res judicata</u>, also known as claim preclusion."  (<u>Id.</u> ¶ 38) (emphasis added)

**E.      <u>Reinstatement of Eviction Proceedings</u>**

On November 14, 2014, Defendant moved to vacate the stay of the eviction proceedings, and the case was restored to the Civil Court's calendar by stipulation in December 2014.  (Oct. 1, 2015 Sieratzki Aff. (Dkt. No. 152-15) ¶ 8)

On February 3, 2015, Defendant moved for a warrant of eviction and a $304,850 judgment for past "use and occupancy" of the apartment[8] – plus attorney's fees incurred in both the eviction proceedings and in the NYSDHR case.  (Feb. 3, 2015 Sieratzki Aff. (Dkt. No. 132-7) ¶ 2; Sept. 21, 2016 HUD Reasonable Cause Determination (Dkt. No. 140-31) at 4)

### F.   Reich's 2015 Reasonable Accommodation Request

In a June 18, 2015 letter to Defendant, Reich again sought permission to keep an "emotional support dog" in his apartment as a reasonable accommodation.  (Def. R. 56.1 Stmt. (Dkt. No. 138) ¶ 39)  The letter states that "Reich has recently been diagnosed with end-stage kidney disease [or ESRD], a potentially fatal medical condition," and that the diagnosis was having "a serious impact on [his] mental and emotional health."  (June 18, 2015 Pltf. Ltr. (Dkt. No. 140-19) at 1)  Included with Reich's letter is a note from his nephrologist, Dr. Dara Huang, which discusses Reich's ESRD diagnosis and his other ailments:

> Mr. Reich has an extensive significant past medical history including longstanding diabetes requiring insulin, hyperlipidemia, gout, hypertension and coronary artery disease status post percutaneous coronary intervention. . . . Despite aggressive medical management to stave off further progression of his disease, his kidney function has worsened to the point of end stage renal disease (ESRD). . . .
>
> [G]iven his current state of having a life-threatening condition . . . , the only treatment option Mr. Reich has at this time is to prepare for renal replacement therapy, [i.e.] dialysis or kidney transplant. . . . The prognosis for ESRD is certain mortality without these necessary interventions.

(May 16, 2015 Dr. Huang Ltr. (Dkt. No. 140-19) at 2)

---

[8]  During the pendency of the eviction proceedings, Defendant allegedly refused to accept Reich's rent payments at the rent-controlled rate.  (Nov. 25, 2014 HUD Cmplt. (Dkt. No. 140-14) at 2)  The back rent that Defendant sought was calculated at well above the rent-controlled rate.  (Reich's Jan. 25, 2016 Response to HUD Data Request (Dkt. No. 140-29) ¶ 17)

Reich also submitted a June 8, 2015 letter from Katz, which reads

as follows:

> In March Mr. Reich was informed . . . that . . . he was now suffering from End Stage Renal Disease (ESRD), and that he would soon need to begin dialysis treatments.  This is a major emotional blow, as it involves the possibility of a shortened lifespan. . . . Reich has begun to falter on his weight-loss regimen (which he had adhered to strictly since mid-March, losing about 30 lbs.), and has slackened in his adherence to the blood testing regimen which determines his multiple daily insulin dosages.  Both . . . are obviously crucial to maintaining his health, and indeed his life.
>
> . . . Early in the treatment I considered him to manifest the traits and symptoms of Narcissistic Personality Disorder.  Over years of working with him I came to realize his traits and symptoms better met criteria for Schizoid Personality Disorder (SPD).
>
> . . . [S]ince approximately September, 2013 Mr. Reich no longer met [the] full DSM-IV criteria for SPD, an improvement I believe was a result of his psychotherapy treatment.  But I noted then that he still showed many of the traits and fears associated with SPD.
>
> Mr. Reich currently meets criteria for Other Specified Personality Disorder, since he still shows mixed personality features characteristic of several personality disorders.
>
> Over the years I have worked with him, Mr. Reich's dog has been a major source of emotional support, and has contributed to the degree of management of his health that he has shown.  He reacts extremely negatively to my even broaching the topic of his possibly losing his dog.  Even now, after more than 13 years of therapy with me, asking him about this makes him profoundly withdraw from me and become despondent, going from voicing trust and comfort with me to quickly feeling completely cut off and experiencing himself as alone and misunderstood in the world.  This reaction typically lasts for several sessions.
>
> I believe that in his depressed state, and given the physical and emotional challenges of worsened health and taxing dialysis treatments, it would be most dangerous to remove the vital support his dog provides him.  Doing this would overwhelm his psychological resources and exacerbate his depression at a critical moment in his life.  And it would likely reduce his capacity to take care of his physical health and thus jeopardize his life.

(June 8, 2015 Katz Ltr. (Dkt. No. 140-19) at 2)

In a June 28, 2015 response to Reich's letter, Defendant asked that he

submit the following information within 10 days:

> Copies of . . . Katz's session notes relating to his session[s] with [Reich]
> for the period commencing May 1, 2014 to the present.  If handwritten,
> they are to be supported by typed copies of same.
>
> Copies of . . . Reich's medical records and medical history, including but
> not limited to medical management provided, tests conducted with their
> results, glomerular filtration rate, MRI, CT scan, ultrasound or contrast x-
> ray, for the period of time Dara Huang MD and the Kidney &
> Hypertension Specialists of New York, P.C. have been seeing/treating
> Reich.

(June 28, 2015 Def. Ltr. (Dkt. No. 140-22))  Defendant's letter further states that

Defendant reserves the right to (1) have Reich examined by Defendant's psychiatric

expert and (2) have Katz, Dr. Huang, and Reich appear to answer questions under oath.

(Id.)

Reich interpreted Defendant's "unreasonable and burdensome requests for

medical information and potential testimony to amount to a denial of [his] reasonable

accommodation request, . . . particularly [given that Defendant] was still actively seeking

to evict [him]."  (Reich Decl. (Dkt. No. 131) ¶ 14)  Accordingly, he never responded to

Defendant's letter.  (Def. R. 56.1 Stmt. (Dkt. No. 138) ¶ 53)

## G.    Reich's 2015 HUD Complaint

On July 27, 2015, Reich filed another complaint with HUD, alleging that

Defendant had denied him a reasonable accommodation by prohibiting him from keeping

his "emotional support dog" in his apartment:

> I am filing this complaint with HUD because my landlord has refused to
> grant me a reasonable accommodation to keep Maddy, my emotional
> support dog.  I am disabled.  I have recently been diagnosed with end
> stage renal disease, which is life-threatening.  I have been in
> psychotherapy for over 13 years for, among other things, depressive

disorder and schizoid personality disorder.  The latest medical diagnosis
has caused my mental and emotional symptoms to worsen.

. . .  This is not the first claim that I have filed with HUD.  In 2006 I filed
the first claim of discrimination when my landlord started an eviction case
against me in housing court because of my dog.  At that time, HUD sent
the complaint to the NY State Division of Human Rights for investigation
and the result was a probable cause determination.

My landlord chose to have the complaint heard in Supreme Court.  . . .
Without giving me the benefit of a trial, Justice George Silver held that I
was not entitled to the accommodation. . . .

. . . . My landlord has now asked the housing court for a warrant of
eviction and back rent in the amount of hundreds of thousands of dollars.
The landlord refused to take the rent all this time and is now demanding
amounts well above our rent-controlled rent.

But that is not all.  The landlord is also demanding that I pay his legal fees
for the Supreme Court action.  He stated in court papers that I should pay
because I filed a HUD complaint.

In May, 2015, I received the latest medical diagnosis.  I asked our attorney
to request a reasonable accommodation, based upon my changed
circumstances.  My attorney made the request to my landlord's lawyer by
letter dated June 18, 2015.  Included were statements from my kidney
specialist and my psychotherapist.  In a response, dated June 28, 2015, my
landlord claimed that my attorney's letter was not a valid request and then
went on to make demands that are so burdensome and onerous that my
lawyer said they constitute a refusal of the accommodation. . . .

(July 27, 2015 HUD Cmplt. (Dkt. No. 140-24); <u>see also</u> Def. R. 56.1 Stmt. (Dkt.

No. 138) ¶ 55))

        In New York County Civil Court, Reich moved for a stay of the

eviction proceedings pending the resolution of his most recent HUD complaint.

(<u>See</u> Oct. 1, 2015 Def. Opp. Aff. (Dkt. No. 152-15))  In an October 1, 2015

affidavit submitted in opposition to Reich's stay motion, Defendant argued that

Reich's emotional support dog serves no medical purpose:

Katz now claims . . . that if Reich had to remove the pet dog, "it would
likely reduce his capacity to take care of his physical health[.]" . . . [T]he

> fact that Reich's diabetes, hypertension and kidney disease has continually
> worsened over the years would compel the indisputable conclusion that
> the dog does not have any positive effect on Reich's health. Thus, Reich
> has failed to show the request for a reasonable accommodation and the
> subsequent HUD complaint, has merit.

(Id. ¶ 29) Defendant went on to argue that "[i]f [Reich] were to provide . . .

information [in response to Defendant's June 28, 2015 letter], it would show that

his latest request and complaint has no merit." (Id. ¶ 19)

On February 26, 2016, the Civil Court stayed the eviction

proceedings pending the resolution of Reich's HUD complaint. (Sept. 21, 2016

HUD Reasonable Cause Determination (Dkt. No. 140-31) at 4)

In a September 21, 2016 decision, HUD concluded that there was

"reasonable cause" to believe that Defendant had violated 42 U.S.C. §§ 3604(f)(2) and

(f)(3)(B) "by denying [Reich's] requests to retain an emotional support animal as a

reasonable accommodation." (Id. at 8) HUD found that Defendant's June 28, 2015 letter

constituted a constructive denial of Reich's June 18, 2015 reasonable accommodation

request:

> [I]n response to [Reich's reasonable accommodation] request,
> [Defendant], by letter dated June 28, 2015, requested that [Reich] provide
> additional, extensive, and intrusive information, agree to submit to a
> medical examination, and have his therapist and physician available to
> appear for interviews under oath. Following this request, [Reich]
> discontinued his engagement with [Defendant], and instead, filed the
> instant complaint on July 27, 2015.
>
> . . . [A] request for a reasonable accommodation may be constructively
> denied in cases where a tenant faces eviction and a landlord requests
> excessive and intrusive information after receiving reliable information (1)
> establishing that the tenant is disabled; (2) describing the requested
> accommodation; and (3) demonstrating the relationship between the
> disability and the requested accommodation. [Reich's] reasonable
> accommodation request letter, in conjunction with the attached letters
> from his therapist [Katz] and physician [Dr. Huang], provide sufficient
> reliable information to establish [Reich's] disabilities and the necessity of

> a support animal to ameliorate the effects of his disabilities.
> Consequently, [Defendant's] subsequent requests for intrusive and
> burdensome information and potential medical examinations are
> tantamount to a refusal to grant the requested accommodation.

(Id.)

HUD also found "reasonable cause" to believe that Defendant had

violated 42 U.S.C. § 3617 by "seeking to intimidate [Reich] and interfere with his

right to a reasonable accommodation."  (Id. at 12)  This determination was based

on HUD's finding that Defendant's "June 28, 2015 request for additional

information and a potential medical examination was excessive, intrusive,

burdensome, and unnecessary," since Reich had already "supplied sufficient

reliable documentation" to support his accommodation request.  (Id.)

HUD issued a charge of discrimination against Defendant on September

21, 2016.  (Def. R. 56.1 Stmt. (Dkt. No. 138) ¶ 82; HUD Charge of Discrimination (Dkt.

No. 140-32))  On October 6, 2016, Defendant elected to proceed in federal court rather

than before an administrative law judge.  (Def. Notice of Election (Dkt. No. 140-33))

This action was commenced on December 7, 2016.  (Cmplt. (Dkt. No. 1))

## H.    2017 Reasonable Accommodation Request

In April 2017, while the instant action was pending, Reich's dog Maddy

died.  (Def. R. 56.1 Stmt. (Dkt. No. 138) ¶ 85)  In a June 7, 2017 letter to Defendant,

Reich asked for permission to adopt another emotional support dog as a reasonable

accommodation.  (Id. ¶ 86; June 7, 2017 Reich Ltr. (Dkt. No. 140-34))  With his letter

Reich included a note from nephrologist Dr. Shuchita Sharma, which reads as follows:

> Mr. Greg Reich is one of our patients in the Home Dialysis Program of
> Mount Sinai Kidney Center.  His medical problems include Hypertension,
> Diabetes Mellitus, Coronary artery disease and End Stage Renal Disease.

14

>He receives five times a week home hemodialysis for his End Stage Renal
>Disease.

(May 4, 2017 Dr. Sharma Ltr. (Dkt. No. 140-34) at 3)

Reich also submitted a letter from Katz supporting Reich's

accommodation request.  That letter reads as follows:

>Over the course of his years in my care, Reich has suffered from recurrent
>manifestations of a depressive disorder. . . . He currently meets criteria for
>Other Specific Depressive Disorder. . . .
>
>. . . . In recent years, he has suffered from End Stage Renal Disease
>(ERSD).  He now requires dialysis treatments five times per week. . . . He
>also required open heart, multiple bypass surgery in 2016.  The need for
>and stress of all of these treatments, combined with ongoing and
>continuing medical problems in his ability to receive the dialysis, has
>brought on several episodes of depression of varying intensity.  Due to his
>medical and emotional problems, he lost his long term job in 2016, and
>now is unemployable, with attendant increased financial strain within his
>household.
>
>I believe his depression affects his ability to adhere to a healthy diet, and
>also affects his motivation to perform the blood testing and insulin
>injecting needed to control his diabetes. Both . . . are obviously crucial to
>maintaining his health, and indeed his life. . . .
>
>Over the years I have worked with him, his dogs have been a major source
>of emotional support – for long periods perhaps his only perceived form of
>emotional support.  They provide a calming and reassuring presence for
>him, and allow him to feel more relaxed when under stress and depressed.
>It is clear the presence of a dog allows him to undergo the rigors of
>dialysis, and improves his willingness to control his food intake and do
>diabetic testing.
>
>I strongly believe that not allowing him the accommodation of a new
>assistance animal would plunge him into a Major Depression, and cause
>him to neglect his diet, his diabetic treatments, and possibly his dialysis
>treatments.  In other words, denying Mr. Reich the reasonable
>accommodation of another emotional support dog would be a serious
>threat to his health and his life.

(May 11, 2017 Katz Ltr. (Dkt. No. 140-34) at 4)

In a June 19, 2017 letter responding to Reich's accommodation request,

Defendant requested that Reich supply the following information within 10 days:

> Copies of Gregory Reich's medical records and medical history, including but not limited to medical management provided, tests conducted with their results, glomerular filtration rate, MRI, CT scan, ultrasound or contrast x-ray, for the period of time Dara Huang MD, Shuchita Sharma, MD and the Kidney Hypertension Specialists of New York, P.C. have been seeing/treating Reich.  Additionally, please provide medical records relating to the claimed ongoing and continuing medical problems regarding his ability to receive dialysis.
>
> The exact breed of the dog you wish to adopt, so that we can have an understanding of the projected height and weight of the dog you want to bring into [the] apartment. . . .

(June 19, 2017 Def. Ltr. (Dkt. No. 140-36))  Defendant's letter states that it might seek

additional information after reviewing discovery in the instant case.  (Id.)

As of June 19, 2017, Defendant had obtained through discovery the

following medical and therapy records:

- 96 pages of Reich's records from Mount Sinai West;
- 233 pages of records produced by Reich's primary care provider;
- 100 pages of records from New York University Medical Center; and
- Three discs of audio files containing Katz's dictated therapy notes and hardcopies of Katz's handwritten session notes.

(Govt. R. 56.1 Stmt. (Dkt. No. 142) ¶ 131)

On September 3, 2017, the building superintendent observed Reich's

husband walking Reich's new dog, Chablis, through the lobby of their building.  (Sept.

12, 2017 Notice to Cure (Dkt. No. 152-16) at 3)  On September 12, 2017, Defendant

served Reich with a "Notice to Cure," which states that if Reich does not remove the

"objectionable dog" from his apartment, Defendant will "elect to terminate" his tenancy.

(Id. at 4; Govt. R. 56.1 Stmt. (Dkt. No. 142) ¶ 136)  The notice reads as follows:

> [Y]ou have violated and continue to violate substantial obligations of your tenancy at 111 East 88th Street . . . pursuant to the terms of the . . . Lease

16

Agreement . . . in that . . . you have permitted and/or are permitting a dog to be kept and/or maintained and/or harbored in [your apartment], without the express written permission of [Defendant]. . . .

[Y]ou are hereby required to cure the aforementioned violations of your tenancy by removing the objectionable dog, on or before September 29, 2017, that being at least fifteen (15) days after the service of this Notice upon you, and that upon your failure to so cure, the Landlord will elect to terminate your tenancy. . . .

(Sept. 12, 2017 Notice to Cure (Dkt. No. 152-16) at 3-4)

## II.     **PROCEDURAL HISTORY**

The Complaint was filed on December 7, 2016.  (Cmplt. (Dkt. No. 1))  In the Amended Complaint filed on September 19, 2017, the Government claims that Defendant (1) violated the FHA, 42 U.S.C. § 3604(f)(2) and (3)(B), by denying Reich's June 18, 2015 and June 7, 2017 reasonable accommodation requests; and (2) interfered with Reich's exercise of rights under the FHA through coercion, intimidation, and threats, in violation of 42 U.S.C. § 3617.  (Am. Cmplt. (Dkt. No. 31) ¶¶ 40-45)

In its answer to the Amended Complaint, Defendant asserts that the Government's claims are barred by res judicata, collateral estoppel, and the Rooker-Feldman doctrine.  (Answer (Dkt. No. 35) ¶¶ 58-82)

Defendant has moved for summary judgment based on these three defenses and because it never denied Reich's accommodation requests.  (Def. Br. (Dkt. No. 137))  The Government has cross-moved for summary judgment on Defendant's res judicata and collateral estoppel defenses.  (Govt. Br. (Dkt. No. 128))

## DISCUSSION

## I.     **SUMMARY JUDGMENT STANDARD**

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, LLC, No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

"[A] plaintiff who uses a summary judgment motion 'to challenge the legal sufficiency of an affirmative defense – on which the defendant bears the burden of proof at trial' – may satisfy [its] burden 'by showing that there is an absence of evidence to support an essential element of the non-moving party's case.'" Green v. Humana At Home, Inc., 380 F. Supp. 3d 400, 410 (S.D.N.Y. 2019), motion to certify appeal denied, 2019 WL 3729390 (S.D.N.Y. Aug. 8, 2019) (quoting FDIC v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)

(internal quotation marks and citation omitted)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment. . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).  "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (internal citations omitted).

## II.   ANALYSIS

### A.   *Res Judicata* and Collateral Estoppel

#### 1.   Applicable Law

"The full faith and credit clause of the Constitution of the United States requires a federal court to give the same preclusive effect to a state court judgment as would be given in the state in which it was rendered." Davidson v. Capuano, 792 F.2d 275, 277-78 (2d Cir. 1986) (citing Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984)); accord Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist., 411 F.3d 306, 310 (2d Cir. 2005).  "The law of preclusion can be divided into two categories:  res judicata (claim preclusion) and collateral estoppel (issue preclusion)." Green v. Dep't of Educ. of City of New York, No. 18 CIV 10817 (AT)

(GWG), 2019 WL 3432306, at *5 (S.D.N.Y. July 31, 2019), report and recommendation

adopted, 2019 WL 4622077 (S.D.N.Y. Sept. 23, 2019).

The doctrine of res judicata provides that

> a valid, final judgment, rendered on the merits, constitutes an absolute bar
> to a subsequent action between the same parties, or those in privity with
> them, upon the same claim or demand.  It operates to bind the parties both
> as to issues actually litigated and determined in the first suit, and as to
> those grounds or issues which might have been, but were not, actually
> raised and decided in that action.  The first judgment, when final and on
> the merits, thus puts an end to the whole cause of action.

Epperson v. Entm't Express, Inc., 242 F.3d 100, 108-09 (2d Cir. 2001) (quoting Saylor v.

Lindsley, 391 F.2d 965, 968 (2d Cir. 1968) (citations omitted)).

Accordingly, "[t]o prove the affirmative defense [of claim preclusion,] a

party must show that (1) the previous action involved an adjudication on the merits; (2)

the previous action involved the plaintiffs or those in privity with them; [and] (3) the

claims asserted in the subsequent action were, or could have been, raised in the prior

action."  Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 285 (2d Cir. 2000) (citations

omitted).  "[T]he burden of proving the elements of res judicata lies with the party

asserting the defense."  Friedman v. Geico Gen. Ins. Co., No. 14-CV-537 (AMD)

(MDG), 2017 WL 10109879, at *11 (E.D.N.Y. Jan. 13, 2017) (citing Monahan, 214 F.3d

at 284) (emphasis added).

"The policies underlying res judicata reflect the sensible goal that where

possible all related claims be resolved in one proceeding."  Epperson, 242 F.3d at 109

(emphasis added).  Res judicata "'relieve[s] parties of the cost and vexation of multiple

lawsuits, conserve[s] judicial resources, and, by preventing inconsistent decisions,

encourage[s] reliance on adjudication.'"  EDP Med. Comp. Sys., Inc. v. United States,

480 F.3d 621, 624 (2d Cir. 2007) (quoting Allen v. McCurry, 449 U.S. 90, 94 (1980)).

"[C]ollateral estoppel, a narrower species of <u>res judicata</u>, precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same." <u>Wenegieme v. U.S. Bank Nat'l Ass'n</u>, No. 16 CIV. 6548 (ER), 2017 WL 1857254, at *9 (S.D.N.Y. May 4, 2017), <u>aff'd</u>, 715 F. App'x 65 (2d Cir. 2018) (internal quotation marks omitted).  "For issue preclusion to apply, the following four requirements must be met:  '(1) the identical issue was actually raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the parties [or their privies] had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.'" <u>Rice v. Schaefer</u>, No. 17C-V2782 (RRM) (PK), 2018 WL 4688949, at *3 (E.D.N.Y. Sept. 27, 2018) (quoting <u>Wyly v. Weiss</u>, 697 F.3d 131, 141 (2d Cir. 2012)) (alteration omitted); <u>see also</u> <u>United States v. E. River Hous. Corp.</u>, 90 F. Supp. 3d 118, 140 (S.D.N.Y. 2015) ("[C]ollateral estoppel is applicable only if . . . the party or one in privity had 'a full and fair opportunity to contest the decision now said to be controlling.'") (quoting <u>Staatsburg Water Co. v. Staatsburg Fire Dist.</u>, 72 N.Y.2d 147, 153 (1988)); <u>Springer v. Lincoln Shore Owners, Inc.</u>, No. 03CV4676 (FB) (KAM), 2007 WL 2403165, at *3 (E.D.N.Y. Aug. 16, 2007) ("Under New York law, '[t]he doctrine of collateral estoppel operates . . . where the parties, or ones in privity with them, had a full and fair opportunity to contest the issues.'") (quoting <u>W.L. Dev. Corp. v. Thalgott</u>, 387 N.Y.S.2d 902, 903 (2d Dep't 1976)).  "The party seeking to invoke collateral estoppel has the burden to show the identity of the issues, while the party trying to avoid application of the doctrine must establish the lack of a full and fair opportunity to litigate." <u>In re Dunn</u>, 24 N.Y.3d 699, 704 (2015).

2.    **Application**

The Government argues that it is entitled to summary judgment on Defendant's res judicata and collateral estoppel defenses, because neither HUD nor the United States was a party, or in privity with any party, to the state court action before Justice Silver.  (Govt. Br. (Dkt. No. 128) at 21-26)

In response, Defendant argues that HUD was in privity with the NYSDHR because (1) HUD referred Reich's 2006 complaint to the NYSDHR for investigation; (2) the NYSDHR is "substantially equivalent" to HUD, and is charged with enforcing state laws that are "substantially equivalent" to the FHA; (3) the NYSDHR receives funding through contracts with HUD to enforce these state laws; and (4) HUD and the NYSDHR have the "same incentives."[9]  (Def. Br. (Dkt. No. 137) at 19, 23-24; Def. Opp. (Dkt. No. 149) at 5; Def. Reply (Dkt. No. 154) at 6)

"Privity requires that a non-party to an earlier litigation must have had his or her interests adequately represented in the prior proceeding by reason of legal interest or control in the first action."  Sweeper v. Tavera, No. 08 CIV. 6372 (HB), 2009 WL 2999702, at *4 (S.D.N.Y. Sept. 21, 2009) (internal quotation marks omitted); see also 273 Lee Ave. Tenants Ass'n by Sanchez v. Steinmetz, 330 F. Supp. 3d 778, 789 (E.D.N.Y. 2018) (same); see also United States v. Katz, No. 10 CIV. 3335, 2011 WL 2175787, at *6 (S.D.N.Y. June 2, 2011) ("Privity requires an independent finding that a party's 'interests were adequately represented by another vested with the authority of representation.'") (quoting Monahan, 214 F.3d at 285).

---

[9]  In its answer, Defendant suggests that HUD was also in privity with Reich.  (Answer (Dkt. No. 35) ¶ 71)  Defendant has since abandoned that argument, however.  See Def. Reply (Dkt. No. 153) at 6 n.2.

"The Supreme Court has stated that 'to bind the United States when it is not formally a party, it must have a laboring oar in a controversy.'" United States v. Power Eng'g Co., 303 F.3d 1232, 1240 (10th Cir. 2002) (quoting Drummond v. United States, 324 U.S. 316, 318 (1945)). "The United States has such a 'laboring oar' when it 'assume[s] control over litigation.'" Id. (quoting Montana v. United States, 440 U.S. 147, 154 (1979)). "In light of the 'severe consequences' of preclusion, where privity is in question, '[d]oubts should be resolved against imposing preclusion to ensure that the party to be bound can be considered to have had a full and fair opportunity to litigate.'" E. River Hous. Corp., 90 F. Supp. 3d at 148-49 (quoting Buechel v. Bain, 97 N.Y.2d 295, 304-05 (2001)).

Here, the record does not demonstrate that there was privity between HUD and the NYSDHR in the action before Justice Silver. Although HUD referred Reich's complaint to the NYSDHR in 2006, there is no evidence that HUD – or any other federal agency – participated in the case after the referral. Indeed, the NYSDHR has affirmed that it was "entirely responsible for filing and prosecuting [the case] on behalf of the State of New York." (Goldstein Aff. (Dkt. No. 132-4) ¶ 10) And HUD represents that it had no involvement "in any decisionmaking by [the] NYSDHR as to the course of that litigation." (Frey Decl. (Dkt. No. 135) ¶ 6) For example, "HUD did not participate in the litigation of the motion in limine" – which led to the dismissal of the NYSDHR's action – or in the NYSDHR's "decision not to appeal the state court's ruling." (Id.)

Although the Defendant points out that the NYSDHR receives funding through contracts with HUD to enforce state laws that are "substantially equivalent" to the FHA (Def. Reply. (Dkt. No. 154) at 6), there is no evidence that HUD's funding of the NYSDHR was tied to the latter's investigation of Reich's complaint, or that the

NYSDHR agreed to vindicate the interests of HUD – or the federal government more broadly – in the state action in exchange for any such funding.

 The Court concludes that HUD was not in privity with the NYSDHR for purposes of the state court litigation before Justice Silver.  See E. River Hous. Corp., 90 F. Supp. 3d at 149 & n.29 (rejecting collateral estoppel and res judicata defenses in FHA action where "the Government cannot be said to have controlled the conduct of any party during [administrative] [NYS]DHR proceeding"); see also United States v. One 1987 Jeep Wrangler Auto., 972 F.2d 472, 478-79 (2d Cir. 1992) (the "state court . . . could [not] have[] adjudicated the federal government's interest . . . [because neither] the federal government nor any of its agencies was a party to the state . . . proceeding"); 18A C. Wright, A. Miller & E. Cooper, Fed. Prac. & Proc. Juris. § 4458 (3d ed.) ("It is clear that state and federal governments are separate parties for res judicata purposes, so that litigation by one does not bind another.").

 Because HUD was not in privity with the NYSDHR in connection with the state court action before Justice Silver, the Government is entitled to summary judgment on Defendant's res judicata and collateral estoppel defenses, and Defendant's cross-motion for summary judgment on these defenses will be denied.[10]

---

[10]  Separate and apart from privity – the issues and facts litigated before Justice Silver are not the same as the issues and factual record before this Court.  For example, Reich was not diagnosed with ESRD until March 2015 – months after the state case was dismissed. (Govt. R. 56.1 Stmt. (Dkt. No. 4) ¶ 5; Dec. 11, 2014 Judgment (Dkt. No. 140-16))  It was only then that Reich began his dialysis regimen, which involves four-hour treatments five days per week.  (Govt. R. 56.1 Stmt. (Dkt. No. 4) ¶¶ 6-7; May 4, 2017 Dr. Sharma Ltr. (Dkt. No. 140-34) at 3)  Katz's opinion regarding Reich's need for an emotional support dog is premised on the impact of ESRD and frequent dialysis on Reich's mental health. (June 8, 2015 Katz Ltr. (Dkt. No. 140-19) at 3-4; May 11, 2017 Katz Ltr. (Dkt. No. 140-34) at 4)

### B.      *Rooker-Feldman* Doctrine

#### 1.      Applicable Law

"The Rooker-Feldman doctrine provides that, in most circumstances, . . .

lower federal courts do not have subject matter jurisdiction to review final judgments of

state courts."  Morrison v. City of New York, 591 F.3d 109, 112 (2d Cir. 2010).

"Rooker-Feldman . . . is a narrow doctrine . . . confined to 'cases brought by state-court

---

Because Reich's need for an emotional support dog was not litigated in the context of his ESRD diagnosis and dialysis regimen, the state court did not adjudicate "the identical issue" for purposes of collateral estoppel.  See Rice, 2018 WL 4688949, at *3.  And because Reich's ESRD diagnosis and dialysis regimen post-date the dismissal of the state action, res judicata likewise does not apply.  See, e.g., TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 499 (2d Cir. 2014) ("'That both suits involved essentially the same course of wrongful conduct' is not decisive.  Such a course of conduct may frequently give rise to more than a single cause of action.  While the prior judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case.'") (quoting Lawlor v. Nat'l Screen Serv. Corp., 349 U.S. 322, 327-28 (1955)); Storey v. Cello Holdings, L.L.C., 347 F.3d 370, 383 (2d Cir. 2003) ("Claims arising subsequent to a prior action need not, and often perhaps could not, have been brought in that prior action; accordingly, they are not barred by res judicata regardless of whether they are premised on facts representing a continuance of the same 'course of conduct[.]'").

Although Defendant contends that Reich's progression to ESRD was "medically inevitable" (Def. Opp. (Dkt. No. 149) at 6), the state court did not consider how such a diagnosis would affect Reich's mental health and his need for an emotional support dog.  Indeed, Justice Silver focused on Reich's present medical condition, and did not discuss Reich's kidney disease or the prospect of dialysis treatments.  (Sept. 5, 2014 Justice Silver Order (Dkt. No. 140-12))

Finally, the Government's claim that Defendant interfered with Reich's exercise of his rights under the FHA, in violation of 42 U.S.C. § 3617 – by demanding that Reich produce burdensome and unnecessary medical information in support of his 2015 and 2017 accommodation requests – was not at issue in the state court action.  (Am. Cmplt. (Dkt. No. 31) ¶¶ 44-45; Sept. 21, 2016 HUD Reasonable Cause Determination (Dkt. No. 140-31) at 11-12)

In sum, there is not identity of issues here, and these circumstances provide a separate and independent basis for granting Plaintiff's motion for summary judgment on Defendant's res judicata and collateral estoppel defenses.

losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'"  Lance v. Dennis, 546 U.S. 459, 464 (2006) (quoting Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005)).

There are four requirements for application of the Rooker-Feldman doctrine:

> First, the federal-court plaintiff must have lost in state court.  Second, the plaintiff must complain of injuries caused by a state-court judgment. Third, the plaintiff must invite district court review and rejection of that judgment.  Fourth, the state-court judgment must have been rendered before the district court proceedings commenced.

Hoblock v. Albany Cty. Bd. of Election, 422 F.3d 77, 85 (2d Cir. 2005) (internal quotation marks, footnote, and alterations omitted).

The first and fourth requirements are "procedural," whereas the second and third are "substantive."  Id.  Where all four requirements are met, a district court must dismiss for lack of subject matter jurisdiction.

### 2.    Application

Defendant's Rooker-Feldman argument fails for multiple reasons.

As an initial matter, the Government did not "los[e] in state court." Accordingly, the first requirement for application of the Rooker-Feldman doctrine is not satisfied here.  See Hoblock, 422 F.3d at 85.

Defendant repeats its privity arguments, however, asserting that (1) HUD referred Reich's complaint to the NYSDHR for investigation and therefore "delegated" responsibility over the case to the state agency; (2) the NYSDHR is "substantially equivalent" to HUD and is charged with enforcing state laws that are "substantially

equivalent" to the FHA; and (3) the NYSDHR receives substantial funding through contracts with HUD to enforce these state laws. (Def. Br. (Dkt. No. 137) at 17-20)

As discussed above, these circumstances are not sufficient to demonstrate that HUD and the NYSDHR are in privity. But even if they were, "the concept of privity is not applicable in the context of the Rooker-Feldman doctrine." Worthy-Pugh v. Deustche Bank Nat'l Tr. Co., No. 3:14-CV-1620 (AWT), 2016 WL 2944535, at *4 (D. Conn. Jan. 29, 2016), aff'd sub nom., 664 F. App'x 20 (2d Cir. 2016). Indeed, in Lance v. Dennis, 546 U.S. at 466, the Supreme Court made clear that the "Rooker-Feldman doctrine does not bar actions by nonparties to the earlier state-court judgment simply because, for purposes of preclusion law, they could be considered in privity with a party to the judgment." Lance also makes clear that the Rooker-Feldman doctrine "applies only in 'limited circumstances,'" and is "not simply preclusion by another name." Lance, 546 U.S. at 466 (quoting Exxon, 544 U.S. at 291).[11]

Because the first requirement for application of the Rooker-Feldman doctrine is not satisfied, the Government is entitled to summary judgment on this defense. See Worthy-Pugh, 2016 WL 2944535, at *4 ("[Plaintiff's] claims are not barred by the Rooker-Feldman doctrine because he was not a party to the state court . . . proceedings."); Osagie v. U.S. Equities Corp., No. 3:16-CV-01311 (VAB), 2017 WL 3668590, at *6 (D. Conn. Aug. 24, 2017) (Rooker-Feldman doctrine inapplicable because

---

[11] While the Lance court declined to address "whether there are any circumstances, however limited, in which Rooker-Feldman may be applied against a party not named in an earlier state proceeding," the Court suggested that Rooker-Feldman might apply "where an estate takes a de facto appeal in a district court of an earlier state decision involving the decedent." Id. at 466 n.2 (emphasis in original). Here, neither HUD nor any other federal agency was a party to the state court action, and there would have been no basis for HUD or any other federal agency to pursue an appeal of Justice Silver's order dismissing the case. Accordingly, the exception discussed in Lance is not applicable.

neither plaintiff nor his estate was a party to the state court proceeding); Rountree v. US Bank NA, No. 15 CIV. 9018 (KPF), 2017 WL 31405, at *14 (S.D.N.Y. Jan. 3, 2017) (Rooker-Feldman doctrine inapplicable where there was no privity between plaintiff and any party to the state court proceedings).

The third requirement for application of the Rooker-Feldman doctrine is likewise not satisfied, because the Government has not "invite[d]" this Court to "review and reject[]" the state court judgment. Hoblock, 422 F.3d at 85. The Government's reasonable accommodation claims here are based on accommodation requests Reich made in 2015 and 2017. Those requests were premised – in significant part – on Reich's purported need for an emotional support dog given his ESRD diagnosis and his dialysis regimen. These circumstances did not exist when Reich first applied for a reasonable accommodation in 2006, and the state court did not consider these circumstances in dismissing the NYSDHR lawsuit.

The state court also did not adjudicate the Government's claim that Defendant had interfered with Reich's exercise of his rights under the FHA by demanding that he produce extensive medical records in connection with his 2015 and 2017 reasonable accommodation requests. (Am. Cmplt. (Dkt. No. 31) ¶¶ 44-45; Sept. 21, 2016 HUD Reasonable Cause Determination (Dkt. No. 140-31) at 11-12) see Hoblock, 422 F.3d at 86 ("[A] federal suit is . . . barred by Rooker-Feldman only if it complains of injury from the state-court judgment and seeks review and rejection of that judgment, but not if it raises 'some independent claim.'"); Borrani v. Nationstar Mortg. LLC, No. 17-CV-9397 (KMK), 2019 WL 1429982, at *7 (S.D.N.Y. Mar. 29, 2019) ("'[I]ndependent claims . . . are outside Rooker-Feldman's compass even if they involve the identical

subject matter and parties as previous state-court suits.'") (quoting <u>Hoblock</u>, 422 F.3d at 86).

For all of these reasons, Defendant's motion for summary judgment based on its <u>Rooker-Feldman</u> defense will be denied.[12]

### C.   <u>Constructive Denial of Reich's Reasonable Accommodation Requests</u>

Defendant contends that it is entitled to summary judgment on the Government's reasonable accommodation claims because it never rejected Reich's request for a reasonable accommodation.  (Def. Br. (Dkt. No. 137) at 27-36)  The Government argues that there are material issues of fact as to whether Defendant's responses to Reich's 2015 and June 2017 reasonable accommodation requests amount to constructive denials of those requests.  (Govt. Br. (Dkt. No. 141) at 27-35)

#### 1.   <u>Applicable Law</u>

"To establish a violation under . . . the FHA . . . for failure to make a reasonable accommodation, a plaintiff must show:  (1) he suffers from a [qualifying] handicap . . . ; (2) defendants knew or reasonably should have known of the plaintiff's handicap; (3) accommodation of the handicap may be necessary to afford plaintiff an

---

[12]  Defendant argues that in <u>Taylor v. Sturgell</u> the Supreme Court "articulated six (6) specific, non-exclusive circumstances under which a nonparty can be bound by a prior state court determination pursuant to the <u>Rooker-Feldman</u> doctrine."  (Def. Reply (Dkt. No. 154) at 5 (citing <u>Taylor</u>, 553 U.S. at 880))  <u>Taylor</u> does not address application of the <u>Rooker-Feldman</u> doctrine, however.  <u>See Newman v. Wells Fargo Bank, N.A.</u>, No. 18 Civ. 2175 (KAM) (SMG), 2019 WL 5694334, at *4 (E.D.N.Y. July 10, 2019) (noting that <u>Taylor</u> addresses "the preclusive effect of judgments against nonparties generally rather than in the context of the <u>Rooker-Feldman</u> doctrine").

In any event, none of the six circumstances described in <u>Taylor</u> are present here.  For example, HUD and the NYSDHR do not share a "legal relationship" akin to "preceding and succeeding owners of property, bailee and bailor, and assignee and assignor." <u>Taylor</u>, 553 U.S. at 894.  And the state court case was not a "[r]epresentative suit" akin to a "class action[]" or a "suit[] brought by trustees, guardians, and other fiduciaries."  <u>Id.</u>

equal opportunity to use and enjoy the dwelling; and (4) defendants refused to make such accommodation." Robbins v. Connecticut Inst. for the Blind, No. 3:10CV1712 JBA, 2012 WL 3940133, at *4 (D. Conn. Sept. 10, 2012) (footnote and internal quotation marks omitted)

Defendant argues that it never denied Reich's 2015 and 2017 accommodation requests. Instead, it merely asked Reich for more information so that it could make an informed decision concerning his accommodation requests. Reich refused to provide the requested information, however. (Def. Br. (Dkt. No. 137) at 13, 27-36)

"Under the fourth prong of the prima facie test, a refusal of a request for a reasonable accommodation 'can be both actual or constructive. . . .'" Logan v. Matveevskii, 57 F. Supp. 3d 234, 257 (S.D.N.Y. 2014) (quoting Groome Res. Ltd. L.L.C. v. Parish of Jefferson, 234 F.3d 192, 199 (5th Cir. 2000)). The "determination of when a request for a reasonable accommodation is constructively denied . . . is highly fact-specific, and is made on a case-by-case basis." Id. at 267; see also Elliott v. QF Circa 37, LLC, No. 16-CV-0288-BAS-AGS, 2018 WL 2933467, at *10 (S.D. Cal. June 12, 2018) (same).

"There is a paucity of case law in the Second Circuit addressing the issue of constructive denial of a request for a reasonable accommodation under the FHA. . . ." Id. at 272. That said, courts have repeatedly found that a months-long delay in responding to a tenant's request for a reasonable accommodation can be "sufficient to constitute constructive denial of a reasonable accommodation." Logan v. Matveevskii, 175 F. Supp. 3d 209, 229 (S.D.N.Y. 2016) (collecting cases). "In assessing whether a defendant has constructively denied a plaintiff's request for an accommodation through unreasonable delay, courts often consider whether the delay was caused by the

defendant's unreasonableness, unwillingness to grant the requested accommodation, or bad faith, as opposed to mere bureaucratic incompetence or other comparatively benign reasons." Logan, 57 F. Supp. 3d at 257.

Courts have also found constructive denial where landlords demand that tenants provide excessive or unnecessary information. Ajit Bhogaita v. Altamonte Heights Condo. Assn., Inc., No. 6:11-CV-1637-ORL, 2012 WL 6562766, at *7 (M.D. Fla. Dec. 17, 2012), aff'd, 765 F.3d 1277 (11th Cir. 2014) ("[B]y persisting in its intrusive request for more[,] and largely irrelevant information, [defendant] constructively denied [plaintiff's] request."); Bhogaita, 765 F.3d at 1286-87 ("[Plaintiff's] failure to respond to that request cannot support [defendant's] position because [defendant] possessed all the information essential to its determination."); see also Sabal Palm Condo. of Pine Island Ridge Ass'n, Inc. v. Fischer, 6 F. Supp. 3d 1272, 1293 (S.D. Fla. 2014) ("[C]ontinuing to delay for months and asking for even more information amounts to a constructive denial.").

Finally, courts have found constructive denial where landlords pursue eviction proceedings or take other adverse action against tenants after reasonable accommodation requests are made. See Revock v. Cowpet Bay W. Condo. Ass'n, 853 F.3d 96, 111 (3d Cir. 2017) ("[Defendant] did not have to deny [plaintiffs] their emotional support animals in order to 'refuse' a reasonable accommodation. As a matter of law, [defendant] may have refused a reasonable accommodation by declaring [plaintiffs] in violation of the 'no dogs' rule [and] by fining them fifty dollars. . . ."); Chavez v. Aber, 122 F. Supp. 3d 581, 600 (W.D. Tex. 2015) (finding constructive denial where "[d]efendants responded to [plaintiff's] accommodation request by . . . filing suits for eviction").

31

Here, there is sufficient evidence to create a genuine issue of material fact as to whether Defendant constructively denied Reich's reasonable accommodation requests.  Although Reich's reasonable accommodation requests were supported by letters from his nephrologists (Dr. Huang and Dr. Sharma) and therapist (Katz), Defendant demanded that Reich provide extensive additional medical information, including his therapist's notes, his nephrologists' medical records, MRIs, CT scans, ultrasound examinations, and x-rays.  Defendant also "reserve[d] the right" to have Reich examined by its psychiatrist, and to take testimony from Reich, his therapist, and his nephrologist.  (June 28, 2015 Def. Ltr. (Dkt. No. 140-22); June 19, 2017 Def. Ltr. (Dkt. No. 140-36))

Defendant argues that a finding of constructive denial cannot be premised merely on a landlord "asking too many questions."  (Def. Br. (Dkt. No. 137) at 27)  But Defendant's extensive demands for therapist notes, medical records, and tests went far beyond asking questions.  Moreover, there is evidence that Defendant's requests for medical information were not made in good faith, and that Defendant intended to deny Reich's accommodation requests regardless of what the requested therapist notes, medical records, and tests revealed.  In October 2015, without having received the requested records, Defendant filed an affidavit in the Civil Court proceeding stating that Reich's deteriorating health "compel[led] the indisputable conclusion that the dog does not have any positive effect" on his condition, and that his reasonable accommodation request therefore lacks merit.  (Oct. 1, 2015 Def. Opp. Aff. (Dkt. No. 152-15) ¶¶ 19, 29) And in response to Reich's June 7, 2017 accommodation request, Defendant again requested extensive medical information – despite having received hundreds of pages of Reich's medical records during discovery.  (Govt. R. 56.1 Stmt. (Dkt. No. 142) ¶ 131)

32

Finally, Defendant was pursuing eviction proceedings against Reich at the same time that it was demanding additional medical information from him.  On September 12, 2017, Defendant served Reich with a "Notice to Cure," which threatened to evict him if he did not remove his dog within 15 days.  (Sept. 12, 2017 Notice to Cure (Dkt. No. 152-16)) see Castellano v. Access Premier Realty, Inc., 181 F. Supp. 3d 798, 809 (E.D. Cal. 2016) (finding constructive denial where "Defendants responded to [plaintiff's] initial request to keep her cat with a Notice to Perform Covenant (Cure) or Quit").

Given these circumstances, there is a genuine issue of material fact as to whether Defendant constructively denied Reich's accommodation requests.  Accordingly, Defendant's motion for summary judgment will be denied.  See Bhogaita, 765 F.3d at 1287 (upholding finding of constructive denial where defendant requested more information, even though medical letters in defendant's possession "described the nature and cause of [plaintiff's] PTSD diagnosis, stated that [plaintiff] was substantially impaired in the major life activity of working, and explained that the dog alleviated [plaintiff's] symptoms").

## **CONCLUSION**

For the reasons stated above, Defendant's motion for summary judgment (Dkt. No. 136) is denied in its entirety.  The Government's motion for summary judgment on Defendant's res judicata and collateral estoppel defenses (Dkt. No. 127) is granted.

This case will proceed to trial on **Monday, July 20, 2020, at 9:30 a.m.** The parties are directed to comply with this Court's Individual Rules concerning the preparation of a pre-trial order.  The joint pre-trial order, motions in limine, proposed voir

dire, and requests to charge are due on **June 1, 2020**.  Responsive papers, if any, are due

on **June 15, 2020**.

Dated: New York, New York
     April 25, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge